No. 23-35600

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Nexon Korea Corporation,

*Plaintiff-Appellant,*

v.

Ironmace Co Ltd., Ju-Hyun Choi,
and Terence Seungha Park,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:23-CV-00576-TL
Honorable Tana Lin

**APPELLANT'S OPENING BRIEF**

Sean M. SeLegue
ARNOLD & PORTER
  KAYE SCHOLER LLP
10th Floor
Three Embarcadero Center
San Francisco, CA 94111
415-471-3100
Sean.SeLegue@arnoldporter.com

Matthew L. Farley
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5000

James S. Blackburn
Oscar Ramallo
ARNOLD & PORTER
  KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
213-243-4000
James.Blackburn@arnoldporter.com

James K. Lee
So Min Lee
ARNOLD & PORTER
  KAYE SCHOLER LLP
76 Saemunan-ro, Jongno-gu
Seoul, Korea (03185)
+82 2 6744-2000

*Attorneys for Appellant Nexon Korea Corporation*

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Nexon Korea Corporation is a wholly owned subsidiary of Nexon Co., Ltd., which is a publicly-traded company.

DATED: December 18, 2023

_____/s/ Sean M. SeLegue_____
SEAN M. SELEGUE
ARNOLD & PORTER
  KAYE SCHOLER LLP
10th Floor
Three Embarcadero Center
San Francisco, CA 94111
415-471-3100
Sean.SeLegue@arnoldporter.com

*Attorney for Appellant*
*Nexon Korea Corporation*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................. v

ISSUE PRESENTED................................................................. 1

INTRODUCTION ................................................................ 2

JURISDICTIONAL STATEMENT ........................................ 5

STATUTORY AUTHORITIES ............................................. 5

STATEMENT OF THE CASE............................................... 5

STATEMENT OF REVIEWABILITY .................................. 6

STATEMENT OF FACTS ...................................................... 6

    A.    Defendants Misappropriated Nexon's Intellectual
            Property to Develop Dark and Darker..............................6

    B.    Nexon Sought Legal Redress Against Defendants,
            Including By Serving a DMCA Takedown Notice And
            Commencing This Action.................................................13

    C.    The District Court Dismissed This Action On Grounds Of
            Forum Non Conveniens Despite Ironmace's Consent To
            This Forum. ....................................................................15

SUMMARY OF THE ARGUMENT.................................... 16

STANDARD OF REVIEW .................................................. 21

ARGUMENT........................................................................ 22

I.   OVERVIEW OF THE DIGITAL MILLENNIUM
     COPYRIGHT ACT TAKEDOWN NOTICE PROCESS ............22

II.  A FOREIGN SUBSCRIBER WHO CHOOSES TO ISSUE
     A DMCA COUNTER NOTICE MAY NOT ESCAPE
     UNITED STATES JURISDICTION BY INVOKING
     FORUM NON CONVENIENS. ................................................27

     A.   Forum Non Conveniens Does Not Apply When A Statute
          Supplies The Rules For Venue. .......................................27

     B.   The DMCA Establishes Both Jurisdiction And Venue....32

          1.   Jurisdiction And Venue Are Co-extensive In
               Copyright Actions. .........................................32

          2.   Contrary To The District Court's Reasoning,
               No Particular Magic Words Must Be In A
               Statute For The Statute To Govern Venue....33

     C.   Allowing Foreign Subscribers To Escape U.S. Jurisdiction
          Would Frustrate The DMCA's Purpose. ..........................36

          1.   The DMCA Permits A Subscriber To Seek
               Restoration Of Content That Is The Subject Of
               A Takedown Notice Only If The Subscriber
               Agrees To Resolve The Dispute In A U.S.
               Court. ............................................................36

          2.   The DMCA Does Not Seek To Protect A
               Foreign Infringer's Convenience. ...................38

     D.   The Five District Court Decisions On Which The District
          Court Relied Do Not Support The Dismissal Order. .......39

iii

E.     Any Prior Forum Selection Clause Is Not Pertinent To The Issues On Appeal ........................................................ 41

CONCLUSION ..................................................................................... 43

STATUTORY ADDENDUM .................................................................. 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AF Holdings, LLC v. Does 1–1058*,
    752 F.3d 990 (D.C. Cir. 2014)........................................................32

*Andrew v. Bowen*,
    837 F.2d 875 (9th Cir. 1988) ........................................................21

*Atlantic Marine Const. Co. v. United States Dist. Ct.*,
    571 U.S. 49 (2013) ................................................................41, 42

*Baltimore & O.R. Co. v. Kepner*,
    314 U.S. 44 (1941) ..........................................................17, 28, 29

*Boise Cascade Corp. v. EPA*,
    942 F.2d 1427 (9th Cir. 1991) ......................................................37

*Boston Telecomms. Grp., Inc. v. Wood*,
    588 F.3d 1201 (9th Cir. 2009) ................................................17, 28

*Brayton Purcell LLP v. Recordon & Recordon*,
    606 F.3d 1124 (9th Cir. 2010) ................................................18, 32

*Cawthon v. Zhousunyijie*,
    No. 22-cv-3021, 2023 WL 6929185 (S.D.N.Y. Oct. 18, 2023).........36

*Cinematix, LLC v. Einthusan*,
    No. 19-cv-02749, 2020 WL 227180 (N.D. Cal. Jan. 15, 2020) .........2

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
    514 F.3d 1063 (10th Cir. 2008) ...................................18, 32, 33, 40

*Editorial Musical Latino Americana, S.A. v.
Mar Int'l Records, Inc.*,
    829 F. Supp. 62 (S.D.N.Y. 1993) ..................................................33

v

*Epic Games, Inc. v. Mendes*,
No. C17-6223, 2018 WL 2926086 (N.D. Cal. June 12, 2018) ........ 40

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) ............................................................ 27, 28, 29

*Labotest, Inc. v. Bonta*,
297 F.3d 892 (9th Cir. 2002) ............................................................ 21

*Lewis v. Liberty Mut. Ins. Co.*,
953 F.3d 1160 (9th Cir. 2020) .......................................................... 21

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
583 F.3d 656 (9th Cir. 2009) ............................................................ 28

*Melendez v. Vaiana*,
No. EDCV162516JGBSPX, 2017 WL 8183139
(C.D. Cal. Oct. 19, 2017)................................................................... 40

*Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.*,
8 F.3d 441 (7th Cir. 1993) ................................................................ 32

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*,
991 F.2d 536 (9th Cir. 1993) ............................................................ 41

*Palmer v. Braun*,
376 F.3d 1254 (11th Cir. 2004) ........................................................ 32

*Real v. Matteo*,
No. C17-1288, 2018 WL 493596 (W.D. La. Jan. 3, 2018) .............. 40

*Suski v. Coinbase, Inc.*,
55 F.4th 1227 (9th Cir. 2022).......................................................... 42

*Tecnologias Avanzadas RD, SRL v. Riegler*,
No. C16-6701, 2017 WL 2772301 (N.D. Cal. June 1, 2017) .......... 40

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) ........................................................................... 41

*United States v. National City Lines,*
    334 U.S. 573 (1948) .......................................................... 17, 30, 31

*United States v. Scophony Corp. of America,*
    333 U.S. 795 (1948) ...................................................................... 31

*Wright v. Edwards,*
    No. C21-6063, 2022 WL 17820247 (E.D.N.Y. July 18, 2022) ........ 40

*Yith v. Nielsen,*
    881 F.3d 1155 (9th Cir. 2018) ...................................................... 37

*Zipfel v. Halliburton Co.,*
    832 F.2d 1477 (9th Cir. 1987), *modified on other*
    *grounds*, 861 F.2d 565 (9th Cir. 1988) ......................... 17, 18, 31, 34

**Statutes**

15 U.S.C. § 22 ................................................................................ 35

17 U.S.C.
    § 501 ............................................................................................. 5
    § 512 ................................................................................. 1, 2, 16
    § 512(c) ................................................................................ 24, 25
    § 512(c)(1)(C) .......................................................................... 25
    § 512(c)(3) ............................................................................ 24, 25
    § 512(g)(1) ................................................................................ 25
    § 512(g)(2) ................................................................................ 26
    § 512(g)(2)(A) .......................................................................... 25
    § 512(g)(2)(B) ..................................................................... 26, 27
    § 512(g)(2)(C) ..................................................................... 27, 36
    § 512(g)(3)(D) ........................................... 25, 26, 33, 37, 38
    § 512(k)(1) .......................................................................... 22, 23

18 U.S.C.
    § 1836 .......................................................................................... 5
    § 1836(c) ...................................................................................... 5

28 U.S.C.
§ 1291 ................................................................................. 5
§ 1331 ................................................................................. 5
§ 1338(a) ............................................................................ 5
§ 1391 .............................................................. 20, 34, 39
§ 1391(c)(3) ............................................................ 20, 39
§ 1400 .......................................................... 18, 32, 35
§ 1404(a) .......................................................................... 28

29 U.S.C. § 1370(c) ............................................................. 35

46 U.S.C.
§ 688 ................................................................................ 31
§ 688(a) ..................................................................... 31, 34

47 U.S.C. § 33 ..................................................................... 35

## Other Authorities

FED. R. APP. P. 4 ..................................................................... 5

144 Cong. Rec. S12, 558 (Oct. 14, 1998) ............................ 23

14D CHARLES ALAN WRIGHT & ARTHUR R. MILLER,
    FEDERAL PRACTICE AND PROCEDURE (4th ed. 2023) ........... 32, 33, 38

President William J. Clinton, *Statement on Signing the
    Digital Millennium Copyright Act* (Oct. 28, 1998) ........................ 22

U.S. Copyright Office, *The Digital Millennium Copyright
    Act of 1998: U.S. Copyright Office Summary*
    (Dec. 1998) .............................................................................. 22

The Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, provides an online service provider with protection from copyright infringement liability arising from content that the provider's subscribers (users) post, so long as the provider complies with certain procedures upon notification of an alleged copyright infringement.

To maintain protection from liability, a provider that receives a DMCA "takedown notice" must remove the challenged content and notify the subscriber. The DMCA permits the subscriber to have the removed material reposted by submitting a counter notice contesting the claim of infringement. Upon receipt of such a counter notice, the provider must repost the challenged material unless the copyright owner provides notice within 10 days of having filed a judicial action against the subscriber.

To facilitate such an action, the user in its counter notice must consent to the jurisdiction of one or more federal district courts. If the subscriber is outside the United States, then it must consent to jurisdiction in any district where the provider "may be found."

The question presented is: May a foreign company that serves a DMCA counter notification, demanding restoration of its content to public view, avoid litigation in federal district court—despite its

consent to being sued there—by subsequently invoking the doctrine of forum non conveniens and forcing the action into a foreign court?

## INTRODUCTION

Despite the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, having been in effect for about 25 years and its "takedown notice" procedure having become a staple of internet commerce, the issue presented is a question of first impression. That is surprising because DMCA takedown notices are common and, as just explained, a counter notice routinely triggers an infringement action. The only explanation is that virtually no other alleged infringer has before had the chutzpah to contend that, despite having consented to being sued in a specific United States district court, it could force the litigation into a foreign court by invoking forum non conveniens.[1]

The issue arises in a high-stakes matter. Defendant-Appellee Ironmace Co. Ltd. ("Ironmace"), like Nexon, a Korean company, developed a video game known as Dark and Darker by engaging in

_____

[1] The only other decision Appellant Nexon Korea Corporation ("Nexon") is aware of that applied forum non conveniens in a DMCA takedown notice case is *Cinematix, LLC v. Einthusan*, No. 19-cv-02749, 2020 WL 227180 (N.D. Cal. Jan. 15, 2020). *Cinematix* does not address the issue presented in this appeal.

blatant misappropriation of Nexon's intellectual property. Defendants-Appellees Ju-Hyun Choi ("Choi") and Terence Seungha Park ("Park") are both former Nexon employees who were leaders in an effort to develop a game known internally at Nexon as P3, a Dungeons & Dragons-inspired dungeon crawling video game.

After leaving Nexon, Choi and Park co-founded Ironmace. At Ironmace, Choi and Park used Nexon's misappropriated intellectual property—and the services of almost half of the former P3 team that they solicited to join them—to complete development of P3 under a different name and claim the game as their own. Unsurprisingly, when Dark and Darker was launched, it was strikingly similar to P3. The two games possess nearly identical characters, settings, and narratives.

The United States is a huge potential market for a video game like Dark and Darker, and Ironmace targeted that market. To that end, Ironmace conducted four alpha playtests of Dark and Darker using Steam, an online gaming platform owned and operated by the Valve Corporation, headquartered in Bellevue, Washington, using U.S.-based gamers to test game play. Upon confirming the similarities between P3 and Dark and Darker, Nexon issued a DMCA "takedown

notice" to Valve.  In response, Valve removed Dark and Darker from Steam and conveyed the takedown notice to Ironmace.

Ironmace then opted to exercise its own rights under the DMCA by issuing a "counter notice" to Valve.  In the counter notice, Ironmace asserted that Dark and Darker had been wrongfully removed from Steam because the game supposedly did not infringe on any copyrights.  As required by the DMCA, Ironmace consented to jurisdiction in the Western District of Washington where Valve is located.  Valve, in turn, informed Nexon that it would restore Dark and Darker to Steam unless Nexon filed suit against Ironmace within 10 business days.  Nexon informed Valve that it had, in fact, already filed this action against Ironmace in the Western District of Washington.

Ironmace filed a motion to dismiss for forum non conveniens, arguing that ongoing litigation between the parties in the Republic of Korea was the better forum to resolve any copyright infringement claim.  Rejecting Nexon's showing that the DMCA supplants forum non conveniens, the district court granted Ironmace's motion to dismiss and relegated Nexon to Korean courts to obtain recompense for Ironmace's unabashed copyright infringement within the United

States.  Because that ruling cannot be reconciled with the DMCA, it must be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 18 U.S.C. § 1836(c), because Nexon's Complaint alleged violations of the Copyright Act, 17 U.S.C. § 501 *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*  ER-147.  The district court entered judgment dismissing Plaintiff's case on August 17, 2023.  ER-4.  Nexon filed a timely notice of appeal on September 14, 2023.  FED. R. APP. P. 4; ER-198-201.  28 U.S.C. § 1291 vests appellate jurisdiction in this Court.

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## STATEMENT OF THE CASE

Nexon commenced this action on April 14, 2023, in the Western District of Washington.  ER-143.  Ironmace moved to dismiss Nexon's Complaint on the basis of forum non conveniens. ER-120.  The district court granted Ironmace's motion and dismissed the action without prejudice on August 17, 2023.  ER-5-20 (opinion); ER-4 (judgment).

## STATEMENT OF REVIEWABILITY

The issue presented was raised in Nexon's opposition to Defendants' motion to dismiss on grounds of forum non conveniens. ER-86. The district court addressed the issue in its order granting the motion. ER-10-12.

## STATEMENT OF FACTS

### A. Defendants Misappropriated Nexon's Intellectual Property to Develop Dark and Darker.

Appellant Nexon Korea Corporation ("Nexon") is a wholly-owned subsidiary of Nexon Co., Ltd., a global game development company with a presence in Japan, Korea, and the United States. ER-52-53. Nexon serves as the "operational head of Nexon group's gaming business." ER-52.

In or around August 2020, Nexon launched the P3 project (P3), which "was envisioned to be a medieval fantasy, dungeon adventure," first person shooter, role playing, person vs. person vs. environment, "and extraction shooter game." ER-58. At Nexon, Choi directed the P3 project until Nexon terminated his employment. ER-152. Park was Nexon's Director of Game Development and the lead game designer of the P3 project. ER-55. Park was also responsible for developing P3's marketing strategy for Western markets. ER-152. In addition to Choi and Park, the P3 team included eight programmers

(including Choi), two game planners (including Park), eleven artists, one mobile designer, and one sound designer. ER-55.

P3's development included registration of nine copyrights with the United States Copyright Office. ER-165-66. This included the P3 source code, the P3 audiovisual game material, and the P3 playtest audiovisual and spoken commentary. ER-165. In addition, Nexon registered 2D artwork for six different P3 character classes: (1) Cleric, (2) Ranger, (3) Barbarian, (4) Tanker, (5) Thief, and (6) Wizard. ER-165-66.

Early versions of the game were received positively, and Nexon approved P3 to proceed from the prototyping phase to the pre-production phase on June 1, 2021. ER-56. After pre-production commenced, Nexon discovered that Choi had exported over 11,000 P3 files to his private servers between December 2020 and June 2021. ER-59. Nexon never authorized Choi to transfer these files to his private network. ER-59. While Choi had previously been authorized to export some source code (but not other build files or art resources) in August 2020 to facilitate remote work during the COVID-19 pandemic, this permission had long since expired. ER-60. Choi again asked for permission to export source code on February 18, 2021. ER-60. Nexon denied this request. ER-60. Despite this denial, Choi

continued to download P3 project materials to his private servers until June 2021.  ER-60-61.  In addition, Choi began soliciting members of the P3 team to leave Nexon to develop a P3-like game at a new gaming company.  ER-61.

Following an internal investigation and disciplinary hearing, Nexon terminated Choi's employment on July 21, 2021.  ER-61.  Soon after, on August 9, 2021, Park left Nexon as well.  ER-61.  That month, Nexon filed a criminal complaint against Choi.  ER-41.  Law enforcement transferred the criminal case to the Prosecutor's Office in Seongnam with a recommendation to indict Choi.  ER-41.  At the same time, Nexon filed a civil suit against Choi, seeking an injunction against trade secret misappropriation and damages.  ER-41.

On August 18, 2021, after half of the P3 team left Nexon, the company temporarily suspended development of P3.  ER-61.  At that time, Nexon was unaware that Choi and Park intended to form Ironmace and develop Dark & Darker.  ER-41.  On October 20, 2021, Choi and Park co-founded Ironmace.  ER-62.  Because Park and Choi had solicited many of their former P3 teammates to leave Nexon to join Ironmace, Ironmace employees included P3 team members Sung-Wook Hyun and Tae Woong Lee, both of whom had unlawfully exported P3 data before leaving Nexon for Ironmace.  ER-61-62.

In August 2022, just ten months after Ironmace was founded, it released Dark and Darker, a game almost indistinguishable from P3, for testing on the American gaming platform Steam. ER-161. The similarities between P3 and that release of Dark and Darker are countless, demonstrating that Ironmace unlawfully completed development of P3 and falsely branded the game as an Ironmace product. Both games are "set in a player vs. player vs. environment" in a medieval setting. ER-167-68. Both games permit the player to act as one of six character classes: Cleric, Ranger, Barbarian, Tanker/Fighter, Thief/Rogue, and Wizard. ER-169. The designs for these six character classes in Dark and Darker are unmistakably similar to the P3 designs, as are the unique character features and movement sequences. ER-170-71 (Barbarian); ER-172 (Cleric); ER-173 (Fighter/Tanker); ER-174 (Wizard); ER-175 (Rogue/Thief); ER-177 (Ranger); ER-176; ER-183.

For example, the character art in the first Dark and Darker release for the Cleric character class was substantially similar to that of P3.  ER-171-72.



*Figure 1 - ER-172.*

The character art for the Rogue character class likewise was substantially similar to that of P3's thief character class.  ER-175.



| P3 | Dark and Darker |
|----|-----------------|

*Figure 2 ER-175.*

In addition, Ironmace copied wholesale other characters unique to P3 to Dark and Darker. ER-177. For just one example, both games include a skeleton wizard wearing a dark hooded robe carrying a wooden staff. ER-179.



| P3 | Dark and Darker |
|----|-----------------|

*Figure 3 ER-179.*

Nexon selected specific monsters to serve as enemies to P3 players, including wraiths, cave trolls, and mimic chests. ER-179. Dark and Darker includes these same enemies. ER-179-80.

The list goes on. Dark and Darker utilizes the same third party generated assets and non-playable characters as P3. ER-177-80. The settings of the two games are practically indistinguishable, and Dark and Darker copied many of P3's unique narrative arcs. ER-181-82.



*Figure 4 ER-182.*

Ironmace conducted five playtests—four alpha playtests and one quality assurance test—of Dark and Darker from August 2022 through April 2023. ER-67. These four alpha playtests were conducted through Steam, which is owned by the Valve Corporation (Valve), headquartered in Bellevue, Washington. ER-67. U.S. gamers were, by far, the largest demographic during the Dark and Darker alpha playtests. ER-62-63.

### B. Nexon Sought Legal Redress Against Defendants, Including By Serving a DMCA Takedown Notice And Commencing This Action.

On February 10, 2023, Nexon sent a certified letter to Ironmace demanding that it cease further infringement of Nexon's copyrights. ER-24. When Ironmace ignored that demand, Nexon on March 22, 2023, sent a DMCA takedown notice to Valve. ER-69. Nexon asserted in the takedown notice that Dark and Darker infringed on several U.S. registered Nexon copyrights. ER-69. Valve responded by removing Dark and Darker from Steam on March 25, 2023. ER-69.

On March 31, 2023, Ironmace filed a lawsuit against Nexon in the Suwon District Court in Korea seeking a declaration that Dark and Darker does not infringe any of Nexon's copyrights. ER-42-43. On April 10, 2023, Ironmace filed an application for a preliminary injunction to enjoin Nexon from exercising its rights under the DMCA by sending takedown notices to online providers. ER-42.

Nexon responded on April 14, 2023, by filing two actions, one in Korea and the present action. First, Nexon sued Ironmace, Choi and Park and in the Suwon District Court in Korea. ER-43. In Nexon's Suwon proceedings, Nexon "alleges that Dark and Darker infringes upon Nexon's copyrights under Korean law, that Defendants misappropriated Nexon's trade secrets under Korean law and that

Defendants used Nexon's work products without its permission (which is unfair to competition)." ER-43.

After Valve removed Dark and Darker from Steam, Ironmace had two options. Ironmace could either transition to working with a non-U.S. based online gaming platform that would not be bound to honor the DMCA takedown notice, or invoke the DMCA by serving a counter notice. Because Ironmace intended for the United States to be the primary market for Dark and Darker, it opted to exercise its rights under the DMCA to ask Valve to reinstate Dark and Darker to Steam for U.S. gamers to access. *See* ER-84 (summarizing Ironmace's consistent efforts to market Dark and Darker in the United States).

On April 20, 2023, Ironmace sent a DMCA counter notice to Valve. ER-109. As the DMCA required, in the counter notice Ironmace consented to the jurisdiction in the Western District of Washington, where Valve is headquartered. ER-117-18. As the DMCA also required, Valve then notified Nexon that, unless Nexon filed suit within ten business days, Valve would restore Dark and Darker to Steam. ER-70. In response, Nexon informed Valve of this already-pending action. ER-70.

### C. The District Court Dismissed This Action On Grounds Of Forum Non Conveniens Despite Ironmace's Consent To This Forum.

Nexon filed its complaint in this action in the Western District of Washington on April 14, 2023. ER-143. In its complaint, Nexon alleged that Ironmace had misappropriated Nexon's trade secrets in violation of the Defend Trade Secrets Act and that Ironmace had infringed Nexon's P3 copyrights in violation of the Copyright Act. ER-147.

Before answering the complaint, Ironmace moved to dismiss Nexon's complaint on the basis of forum non conveniens. ER-120-42. In its motion, Ironmace argued that this action should be dismissed because Nexon could litigate its intellectual property claims in Korea. ER-130. In opposition, Nexon argued that the DMCA precludes the application of forum non conveniens. ER-86. In the alternative, Nexon asserted that because of Korea's inadequate pre-trial discovery procedures, Korea was not an adequate alternative forum for Nexon's intellectual property claims. ER-80-81.

The district court disagreed with Nexon on both points, first holding that the DMCA does not preclude application of forum non conveniens. ER-10-12. Then, applying the doctrine of forum non conveniens, the district court concluded that Korea was an adequate alternative forum for Nexon's intellectual property claims, that Choi

and Park's employment agreements with Nexon included a valid forum selection clause designating Seoul Central District court as the proper forum for work-related intellectual property disputes, and that the private and public interest factors favored dismissing Nexon's complaint in favor of the pending Korean litigation. ER-5-20.

Based on those rulings, the district court dismissed Nexon's claims without prejudice on August 17, 2023. ER-4. Nexon timely appealed on September 14, 2023. ER-198-201.

## SUMMARY OF THE ARGUMENT

Enacted in 1998, the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, provides online service providers with protection from liability when their subscribers post content that infringes the copyright of another. To obtain that protection, providers must comply with a specific protocol when infringement disputes arise. If a copyright owner serves a provider with a compliant DMCA "takedown notice," the provider must expeditiously remove, or disable access to, the allegedly infringing content.

The person who posted the material—the "subscriber"—may serve a counter notice contesting the infringement claim. To be effective, the subscriber in its counter notice must consent to jurisdiction in the federal district court where the subscriber is located (for a domestic

subscriber) or, for a foreign subscriber, in any district where the provider "may be found." Upon receipt of a valid counter notice, the provider must notify the person who provided the takedown notice and, unless the provider receives notice within ten days from the person who served the takedown notice that an action has been filed against the accused infringer, the provider must restore the content. *See* Part I, *infra.*

Forum non conveniens, an "exceptional tool to be employed sparingly" (*Boston Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) (internal quotation marks omitted)), permits dismissal of an action—even when jurisdiction is established and venue is proper—to take account of various public and private interests that might favor litigation in a foreign forum. However, when a statute gives plaintiffs a right to sue in a particular location, forum non conveniens is no longer available. *E.g., Baltimore & O.R. Co. v. Kepner*, 314 U.S. 44 (1941); *United States v. National City Lines*, 334 U.S. 573 (1948); *Zipfel v. Halliburton Co.*, 832 F.2d 1477 (9th Cir. 1987), *modified on other grounds*, 861 F.2d 565 (9th Cir. 1988). The DMCA does just that. *See* Part II(A), *infra.*

The district court concluded that the consent the DMCA requires in a counter notice does not establish venue, only jurisdiction, because

the DMCA does not expressly refer to venue, only to jurisdiction. In so ruling, the district emphasized that jurisdiction and venue are "two, distinct concepts" (ER-10-12), but that is not so in copyright infringement actions. The copyright venue statute, 28 U.S.C. § 1400, provides that venue is proper wherever the defendant "may be found," *i.e.,* so long as the court can exercise personal jurisdiction over the defendant.

In copyright law, therefore, jurisdiction and venue are co-extensive. *See, e.g., Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1126 (9th Cir. 2010) ("in copyright action, venue is proper in any judicial district where, if treated as a separate state, the defendant would be subject to jurisdiction") (emphasis added); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 n.2 (10th Cir. 2008) (Gorsuch, J.) (in copyright infringement suits, "the question of venue is essentially swallowed by the jurisdictional analysis"). Even in a non-copyright case, this Court has recognized that a statute vesting jurisdiction in a particular district functions equally as a venue provision. *See Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1487 (9th Cir. 1987), *modified on other grounds*, 861 F.2d 565 (9th Cir. 1988). *See* Part II(B)(1), *infra.*

The district court concluded that the DMCA's reference to jurisdiction over the "subscriber," rather than to where a "civil action may be brought," meant that the DMCA did not govern venue. ER-11 (emphasis omitted). But the statute need not employ magic words to govern venue, as this Court's ruling in *Zipfel* demonstrates; there, a statute establishing "jurisdiction" in a district functioned equally as a venue determination. Further, the DMCA's reference to where a party "may be found" is consistent not only with establishing jurisdiction but also venue. *See* Part II(B)(2), *infra.*

Allowing Ironmace to invoke forum non conveniens would frustrate the DMCA's purpose. Nexon registered its copyrights with the United States Copyright Office, and it brought this action to enforce its rights under United States law for infringements using a U.S. gaming platform directed toward predominantly U.S.-based consumers. The DMCA takedown notice procedure contemplates, as its final step, resolution of the copyright issues in a federal district court. Ironmace consented to being sued in the Western District of Washington when it sought to take advantage of rights the DMCA grants. Permitting Ironmace to escape litigation in the Western District of Washington would undermine the careful balance the

DMCA established between the rights of subscribers like Ironmace and copyright holders such as Nexon. *See* Part II(C)(1), *infra.*

In addition, the DMCA's jurisdictional provision is not, unlike the typical venue statute, intended to protect defendants from being haled into a distant court. Regarding a foreign defendant like Ironmace, the DMCA's jurisdictional provision takes into account only where *the service provider* may be found, paying no heed to the defendant's interests. That is consistent with the general venue statute, 28 U.S.C. § 1391, which provides that a foreign defendant may be sued in any district with jurisdiction over that defendant. *Id.* § 1391(c)(3); *see* Part II(C)(2), *infra.*

The district court incorrectly relied on five off point district court decisions. The district court correctly noted that, in each of those cases, the court interpreted the DMCA's counter notice consent requirement as a consent to personal jurisdiction. That is hardly controversial, as that is exactly what the statute states. But none of those cases address whether the consent requirement applies equally to venue nor whether the consent requirement vitiates the doctrine of forum non conveniens. Accordingly, these five decisions do not bear on the issue presented one way or another. *See* Part II(D), *infra.*

Finally, any argument that forum selection clauses in Park and Choi's employment agreements with Nexon require litigation in Korea is of no matter. Such a clause may be enforced, if at all, through forum non conveniens. In situations such as this one, where forum non conveniens cannot be applied, a forum selection clause has no effect. Further, Ironmace's express consent to jurisdiction in the Western District of Washington superseded any prior forum selection agreement. *See* Part II(E), *infra.*

## STANDARD OF REVIEW

This Court reviews the "district court's dismissal 'on the basis of *forum non conveniens* for an abuse of discretion.'" *Lewis v. Liberty Mut. Ins. Co.,* 953 F.3d 1160, 1163 (9th Cir. 2020). "'An abuse of discretion occurs if the district court based its decision on an erroneous legal conclusion or a clearly erroneous finding of fact.'" *Labotest, Inc. v. Bonta*, 297 F.3d 892, 894 (9th Cir. 2002) (quoting *Andrew v. Bowen*, 837 F.2d 875, 877 (9th Cir. 1988)).

**ARGUMENT**

**I.**

**OVERVIEW OF THE DIGITAL MILLENNIUM COPYRIGHT ACT
TAKEDOWN NOTICE PROCESS**

In 1998, as the internet was beginning to see mass adoption, Congress enacted the Digital Millennium Copyright Act. The Act came into being "at a time when technological innovations present[ed] . . . great opportunities for the global distribution of copyrighted works" and when those "same technologies . . . ma[d]e it possible to pirate copyrighted works on a global scale with a single keystroke." President William J. Clinton, *Statement on Signing the Digital Millennium Copyright Act* (Oct. 28, 1998). The DMCA was drafted to implement two World Intellectual Property Organization ("WIPO") treaties, the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty. *See id.* To implement the WIPO treaties, the DMCA made it unlawful to circumvent technological copyright measures or to tamper with copyright management information. *See* U.S. Copyright Office, *The Digital Millennium Copyright Act of 1998: U.S. Copyright Office Summary* at 2 (Dec. 1998).

In addition to implementing the WIPO treaties, the DMCA also addressed the liability of online service providers (such as YouTube or Etsy) in copyright infringement actions. Under the DMCA, a "service

22

provider" is a "provider of online services or network access," including any "entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1).

An everyday example of a service provider is YouTube, which permits users to upload content of the user's choosing without any modification from YouTube. When the DMCA was enacted, it was unclear what legal consequences would flow to online platforms like YouTube on which subscribers often post content infringing on the copyrights of third parties. The Senate, therefore, refused to ratify the WIPO treaties until after "the President sign[ed] into law a bill that implements the Treaties, and that shall include clarifications to United States law regarding infringement liability for online service providers, such as contained in [the DMCA]." 144 Cong. Rec. S12,558 (Oct. 14, 1998). The Senate further required annual reports on "U.S. efforts to encourage non-signatory countries to sign, ratify, implement, and enforce the Treaties, including efforts to encourage the clarification of laws regarding Internet service provider liability." *Id.*

The DMCA grants a service provider hosting possibly infringing content immunity from liability to either the copyright owner for publishing the content, or to the subscriber who posted the allegedly infringing content for removing it, so long as the service provider complies with the DMCA's takedown notice protocol.

In the first step of that protocol, a copyright owner who discovers content posted online that it believes infringes on its copyrights may issue a "takedown notice" to the service provider asking the service provider to remove, or disable access to, the infringing content. 17 U.S.C. § 512(c). To be effective, the takedown notice must include: (1) "[a] physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;" (2) "[i]dentification of the copyrighted work claimed to have been infringed;" (3) "[i]dentification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;" (4) "[i]nformation reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted;" (5) "[a] statement

that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law;" and (6) "[a] statement that the information in the notice is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed."  *Id.* § 512(c)(3).

"[U]pon notification of claimed infringement," *i.e.*, a takedown notice, a service provider must "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."  *Id.* § 512(c)(1)(C).  Taking such action insulates the service provider from infringement liability.  *Id.*

Removing the allegedly infringing material, however, could expose the service provider to liability to the subscriber who posted the allegedly infringing content.  Accordingly, the DMCA affords protection from such possible liability if the provider takes "reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material."  *Id.* § 512(g)(1), (2)(A).

Once aware that its content has been disabled or removed by the service provider, the subscriber may have the content reinstated by the service provider by sending the service provider a "counter notice." "To be effective, . . . a counter notification" must "include substantially

the following:" (1) "[a] physical or electronic signature of the subscriber;" (2) "[i]dentification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled;" (3) "[a] statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled;" (4) "[t]he subscriber's name, address, and telephone number;" (5) "that the subscriber will accept service of process from the person who provided" the takedown notice or an agent of such person; and (6) a statement consenting to jurisdiction of a federal District Court. If the subscriber's address is in the United States, the subscriber must consent "to the jurisdiction of Federal District Court for the judicial district in which the [subscriber's] address is located." *Id.* § 512(g)(3)(D). Or, "if the subscriber's address is outside of the United States," it must consent to the jurisdiction of "any judicial district in which the service provider may be found." *Id.*

Upon receipt of a compliant counter notice, a service provider must do two things to retain immunity from liability. *Id.* § 512(g)(2). First, the service provider must "promptly provide[]" the person who provided the takedown notice "with a copy of the counter notification,

26

and inform[] that person that [the service provider] will replace the removed material or cease disabling access to it in 10 business days." *Id.* § 512(g)(2)(B). Second, the service provider must "replace[] the removed material and cease[] disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice." *Id.* § 512(g)(2)(C).

That, however, is not the end of the process. If the service provider "first receives notice from the person who submitted the [takedown notification] that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network," the service provider is no longer required to "replace[] the removed material," or "cease[] disabling access to it," to retain its immunity. 17 U.S.C. § 512(g)(2)(C).

## II.

### A FOREIGN SUBSCRIBER WHO CHOOSES TO ISSUE A DMCA COUNTER NOTICE MAY NOT ESCAPE UNITED STATES JURISDICTION BY INVOKING FORUM NON CONVENIENS.

#### A. Forum Non Conveniens Does Not Apply When A Statute Supplies The Rules For Venue.

"The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is

authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947). The doctrine "is an exceptional tool to be employed sparingly." *Boston Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) (internal quotation marks omitted). "A party seeking dismissal of an action on forum non conveniens grounds 'must show two things: (1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal.'" *Id.* (quoting *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009)). Since the enactment of 28 U.S.C. § 1404(a), which permits transferring cases among the federal district courts, the doctrine of forum non conveniens applies only to dismissal when a foreign venue provides an adequate alternative venue.

The Supreme Court has recognized that other statutes can foreclose application of forum non conveniens as well. *See Gulf Oil*, 330 U.S. at 505 (a "plaintiff's choice of a forum cannot be defeated on the basis of forum non conveniens" when precluded by statute). In *Baltimore & O.R. Co. v. Kepner*, 314 U.S. 44 (1941), an injured Ohio employee brought suit against an interstate railroad in New York under the Federal Employers' Liability Act ("FELA"). *Id.* at 48. The railroad petitioned the Supreme Court to enjoin prosecution of the

employee's suit in New York, alleging that the plaintiff was "acting in a vexatious and inequitable manner in maintaining the federal court suit in a distant jurisdiction when a convenient and suitable forum is at respondent's doorstep." *Id.* at 51.

In assessing the railroad's attempt to enjoin the employee's suit, the Court looked at the FELA's venue provisions, which were added after the FELA's initial enactment. When FELA was enacted, venue was determined by the general venue statute, which often required injured employees to litigate far from home. *Id.* at 49. In response to this burden on injured employees, Congress amended the FELA to provide that "an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action." *Id.* at 49.

The Supreme Court determined that the FELA venue provision "filled the entire field of venue in federal courts" and that a "privilege of venue granted by the legislative body which created this right of action cannot be frustrated for reasons of convenience or expense." *Id.* at 54; *Gulf Oil*, 330 U.S. at 505. The employee was, therefore, permitted to litigate the suit where he so chose, regardless of whether

forum non conveniens would previously have been available to effect a change of forum.

The Court reached the same conclusion seven years later when considering the Clayton Act. *See United States v. National City Lines*, 334 U.S. 573 (1948). There, the United States brought an antitrust action against nine domestic corporations. *Id.* at 575. The Court held that the Clayton Act precluded application of forum non conveniens by permitting the plaintiff "to institute the suit in a district, frequently that of his own residence, in which the corporation in fact transacts business," and not only where the corporation "resides or may be 'found.'" *Id.* at 580.

When a statute broadens the choice of venue, "to have [that choice] narrowed again by application of the vague and discretionary power comprehended by forum non conveniens would [be] incongruous, to say the least." *Id.* at 581. Accordingly, no "room was left for judicial discretion to apply the doctrine of forum non conveniens so as to deprive the plaintiff of the choice given by" statute. *Id.* at 588. Reminiscent of Ironmace's attempt to invoke its rights under the DMCA by serving a counter notice, only later to seek to move Nexon's case to Korea contrary to Ironmace's consent to jurisdiction, *National City Lines* held that the Clayton Act did not permit a "foreign

corporation [to] come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due." *Id.* at 580 (quoting *United States v. Scophony Corp. of America*, 333 U.S. 795, 808 (1948)).

In *Zipfel v. Halliburton Co.*, 832 F.2d 1477 (9th Cir. 1987), *modified on other grounds*, 861 F.2d 565 (9th Cir. 1988), this Court, too, recognized that statutes may prevent application of forum non conveniens. There, the Court held that the Jones Act, 46 U.S.C. § 688, which allows injured sailors to file suit against their employers for negligence, precluded application of forum non conveniens. *Zipfel*, 832 F.2d at 1487. The Jones Act provides that "[j]urisdiction in [actions under that Act] shall be under the court of the district in which the defendant employer resides or in which his principal office is located." *Id.* (quoting 46 U.S.C. § 688(a)).

*Zipfel* compared the FELA provisions addressed in *Kepner* with the Jones Act, noting that "both the Jones Act and the FELA have specific venue provisions." *Id.* at 1487. *Zipfel* looked at the "degree of similarity between the specific venue provisions under the Jones Act and under the FELA," concluding "that the *forum non conveniens* doctrine should be unavailable as a ground for dismissal under the Jones Act as it is under the FELA." *Id.*

### B. The DMCA Establishes Both Jurisdiction And Venue.

#### 1. Jurisdiction And Venue Are Co-extensive In Copyright Actions.

In the DMCA, like the FELA and the Jones Act, Congress enacted a specific venue provision applicable to copyright cases involving a DMCA counter notice. The district court concluded otherwise, principally because the DMCA provision uses only the word "jurisdiction," and because "[j]urisdiction and venue are two, distinct concepts." ER-10-12. But the district court did not consider the basic principle that, in copyright infringement suits, "the question of venue is essentially swallowed by the jurisdictional analysis." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 n.2 (10th Cir. 2008) (Gorsuch, J.).

The courts have uniformly interpreted the copyright venue statute, 28 U.S.C. § 1400, to mean that venue is proper in a copyright infringement action "in any judicial district where, if treated as a separate state, *the defendant would be subject to jurisdiction.*" *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1126 (9th Cir. 2010) (emphasis added); *Milwaukee Concrete Studios , Ltd. v. Fjeld Mfg. Co.*, 8 F.3d 441, 445 (7th Cir. 1993); *Palmer v. Braun*, 376 F.3d 1254, 1259–60 (11th Cir. 2004); *AF Holdings, LLC v. Does 1– 1058*, 752 F.3d 990, 996 (D.C. Cir. 2014); 14D CHARLES ALAN WRIGHT

& Arthur R. Miller, Federal Practice and Procedure § 3819 (4th ed. 2023); *see also Dudnikov*, 514 F.3d at 1069 n.2 ("the only basis for challenging venue in copyright actions is that the absence of personal jurisdiction in a forum renders venue improper"). It is no surprise, therefore, that the DMCA established both jurisdiction and venue by using only the word "jurisdiction," rather than "jurisdiction and venue."

Thus, the district court's comments that "jurisdiction and venue are two, distinct concepts" and "there is no indication from the DMCA that Congress intended to conflate the two" (ER-10-12) are incorrect. The DMCA is a copyright statute, and "venue and jurisdiction are coextensive" in copyright actions. *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F. Supp. 62, 66 (S.D.N.Y. 1993).

### 2. Contrary To The District Court's Reasoning, No Particular Magic Words Must Be In A Statute For The Statute To Govern Venue.

As discussed above, Congress required that any subscriber whose "address is outside of the United States" state in its counter notice that it "consents to the jurisdiction" of "any judicial district in which the service provider may be found." 17 U.S.C. § 512(g)(3)(D). The district court commented that this statutory language must not relate to

venue because "[v]enue refers to where a *civil action* may be brought . . . [b]ut the DMCA only speaks to jurisdiction over the *subscriber.*" ER-11 (emphasis in original). That was incorrect.

There is no requirement that a venue statute expressly state where a "civil action may be brought," as does the general venue statute to which the district court cited, 28 U.S.C. § 1391. The Jones Act provision at issue in *Zipfel* also refers only to "jurisdiction," but this Court recognized that it was equally a "venue provision[]." *Zipfel*, 832 F.2d at 1487. "The portion of the Jones Act which pertains to jurisdiction *and venue* provides: 'Jurisdiction in [Jones Act cases] shall be under the court of the district in which the defendant employer resides or in which his principal office is located.'" *Id.* (quoting 46 U.S.C. § 688(a)) (emphasis added). The same reasoning applies to the DMCA provision at issue here.

Indeed, the statute discussed in *Zipfel* proves the point because, while this Court in *Zipfel* determined that statute to be a venue provision, it does not include the words "civil action may be brought," the absence of which in the DMCA the district court incorrectly thought significant. Just like the DMCA provision at issue here, the pertinent portion of the Jones Act refers only to "jurisdiction." As

*Zipfel* recognizes, a statute that establishes jurisdiction in a particular district cannot be undone by invoking forum non conveniens.

Even if the Court were looking for language in the DMCA signaling that it governs not just jurisdiction but also venue, the DMCA provision's reference to where the provider "may be found" resonates with numerous other venue statutes. The general copyright venue statute itself permits a copyright infringement action to be filed "in the district in which the defendant or his agent resides *or may be found*" (28 U.S.C. § 1400 (emphasis added)), and numerous other statutes do the same. *See, e.g.,* 15 U.S.C. § 22 ("Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it *may be found* or transacts business.") (emphasis added); 47 U.S.C. § 33 (Actions concerning submarine cables "may be commenced in the district court for any district within which the defendant *may be found.*") (emphasis added); 29 U.S.C. § 1370(c) (Actions concerning termination of single employer insurance plans "may be brought in the district where the plan is administered, where the violation took place, or where the defendant resides or *may be found.*") (emphasis added). Accordingly, that Congress chose to use the words "may be found" in this provision of

the DMCA confirms that Congress had in mind venue as well as jurisdiction.

### C. Allowing Foreign Subscribers To Escape U.S. Jurisdiction Would Frustrate The DMCA's Purpose.

#### 1. The DMCA Permits A Subscriber To Seek Restoration Of Content That Is The Subject Of A Takedown Notice Only If The Subscriber Agrees To Resolve The Dispute In A U.S. Court.

The DMCA's requirement that a subscriber serving a counter notice must consent to jurisdiction "is best understood to reflect the subscriber's acceptance that, if it posts material on a service provider's website and demands that such material be restored, *it will allow its accuser to seek a court order from a United States court* adjudicating the competing rights under United States copyright law between it and the person who accuses it of infringement." *Cawthon v. Zhousunyijie*, No. 22-cv-3021, 2023 WL 6929185, at *6 (S.D.N.Y. Oct. 18, 2023) (emphasis added).

Filing a court action is inextricably tied to the final step in the takedown notice process, in which the copyright owner *must* "file[] an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network." 17 U.S.C. § 512(g)(2)(C). The statute is structured to subject the foreign infringer to jurisdiction in the United

States for the very suit that the copyright owner must file to avoid having its protected content again posted on the internet.

If the foreign infringer could use a counter notice to seek to have its infringing content restored, only to then abscond from accountability to the United States courts, the DMCA's purpose would be completely frustrated. *See Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) (Courts must "mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."); *Yith v. Nielsen*, 881 F.3d 1155, 1168 (9th Cir. 2018) ("[S]tatutory interpretation always depends upon reading the whole statutory text, considering the purpose and context of the statute.") (internal quotation marks omitted).

Notably, Congress chose in the DMCA to afford more liberality of venue to the plaintiff when a foreign subscriber is involved, by comparison to a domestic infringer. A domestic subscriber must agree to jurisdiction only in the district where the subscriber's address is located. 17 U.S.C. § 512(g)(3)(D). A foreign subscriber, in contrast, must agree to be sued in "any judicial district in which the service provider may be found," a broader concession. *Id.*

Had Congress believed litigation in a foreign subscriber's home country was sufficient, it could have stayed silent on the question of where or whether foreign subscribers must consent to the jurisdiction of a United States federal district court. It makes no sense to think that Congress would grant liberality in venue selection in an action against a foreign subscriber accused of infringing U.S. registered copyrights only to permit the foreign infringer to avoid U.S. litigation entirely by application of forum non conveniens.

### 2. The DMCA Does Not Seek To Protect A Foreign Infringer's Convenience.

Venue statutes commonly protect the defendant from being haled into a far-away court that has no connection to either the defendant or the conduct underlying the case. *See* WRIGHT & MILLER, § 3802. Here, the DMCA provision reflects no such concern regarding an action against a foreign infringer. An accused foreign infringer who serves a DMCA counter notice must consent to litigate in any district where *the service provider* may be found (17 U.S.C. § 512(g)(3)(D)), affording no concern whatsoever with the accused foreign infringer's convenience. This is another indication that Congress did not intend that an accused foreign infringer like Ironmace could escape the U.S. courts after serving a DMCA counter notice by arguing that the forum(s) to which the foreign infringer had agreed were inconvenient.

The only logical reason for Congress structuring venue in this way is not to look after the infringer's convenience but rather to ensure that the court the plaintiff selects would have jurisdiction over the service provider as well, if necessary.

That Congress did not intend to protect foreign infringer's convenience in venue selection is further confirmed by the general venue statute, 28 U.S.C. § 1391. Under Section 1391, venue and jurisdiction are coextensive for a foreign defendant—just as in copyright actions generally (*see* p.18, *supra*)—because "a defendant not resident in the United States may be sued in *any* judicial district." 28 U.S.C. § 1391(c)(3) (emphasis added). That means a foreign defendant may be sued in any judicial district so long as the foreign defendant is subject to that court's personal jurisdiction.

Congress, therefore, would have had no reason to specify in the DMCA that a foreign subscriber submitting a counter notice must consent to both jurisdiction *and* venue; as far as Congress is concerned, a foreign defendant's consent to a court's jurisdiction agrees to venue as well.

### D. The Five District Court Decisions On Which The District Court Relied Do Not Support The Dismissal Order.

The district court cited five district court decisions in support of its reliance on the jurisdiction/venue distinction, stating that

"[s]everal courts in this Circuit have found that, under the DMCA, a counter notification serves as consent to personal jurisdiction *only*." ER-11-12 (emphasis added) (citing *Epic Games, Inc. v. Mendes*, No. C17-6223, 2018 WL 2926086, at *5 (N.D. Cal. June 12, 2018); *Melendez v. Vaiana*, No. EDCV162516JGBSPX, 2017 WL 8183139, at *3 (C.D. Cal. Oct. 19, 2017); *Tecnologias Avanzadas RD, SRL v. Riegler*, No. C16-6701, 2017 WL 2772301, at *2 (N.D. Cal. June 1, 2017); *Real v. Matteo*, No. C17-1288, 2018 WL 493596, at *5 (W.D. La. Jan. 3, 2018), *report and recommendation adopted*, 2018 WL 494271 (W.D. La. Jan. 19, 2018); *Wright v. Edwards*, No. C21-6063, 2022 WL 17820247, at *6 (E.D.N.Y. July 18, 2022)). The court erred in doing so.

While the five decisions did conclude that submission of a counter notice is consent to personal jurisdiction, they did not hold that the consent was *limited* to personal jurisdiction, excluding venue. As discussed above, in copyright actions, jurisdiction and venue are inextricably linked. *Dudnikov*, 514 F.3d at 1069 n.2. Nor did those five decisions address whether forum non conveniens is available to a defendant who took advantage of the opportunity to issue a DMCA counter notice. Consequently, these five district court decisions provide no support whatsoever for the district court's conclusion that

a DMCA counter notice subjects the issuer *only* to personal jurisdiction, having no effect on venue or the availability of forum non conveniens. A decision is not precedent on a point neither raised in briefs nor discussed in the Court's opinion. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37–38 (1952); *see also Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 541 (9th Cir. 1993) ("It is a venerable principle that a court isn't bound by a prior decision that failed to consider an argument or issue the later court finds persuasive.") (citing *L.A. Tucker Truck Lines*, 344 U.S. at 37–38). The district court, therefore, erred in relying on these opinions to support its conclusion that the DMCA permits application of forum non conveniens.

### E. Any Prior Forum Selection Clause Is Not Pertinent To The Issues On Appeal.

The district court's ruling relied in part on forum selection clauses in Choi and Park's employment agreements with Nexon. ER-12-15. Those agreements designated Seoul Central District court as the forum for work-related intellectual property disputes. Those agreements have no bearing on the issue on appeal for two reason.

First, a forum selection comes into play only through the doctrine of forum non conveniens. *Atlantic Marine Const. Co. v. United States Dist. Ct.*, 571 U.S. 49, 60 (2013) ("[T]he appropriate way to enforce a

41

forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens"). Because, for the reasons already shown, the district court should not have reached the forum non conveniens analysis, the forum selection clause cannot support the dismissal.

Second, Ironmace's consent in its DMCA counter notice to litigate in the Western District of Washington superseded, or at a minimum supplemented, any prior forum selection clause. *Cf. Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1231 (9th Cir. 2022) (finding that a subsequent forum selection clause superseded a prior arbitration agreement).

**CONCLUSION**

For the foregoing reasons, the order granting Defendants' motion to dismiss and the district court judgment should be reversed and the case remanded for further proceedings.

DATED: December 18, 2023

Respectfully,

ARNOLD & PORTER KAYE SCHOLER LLP
SEAN M. SELEGUE
JAMES K. LEE
JAMES S. BLACKBURN
OSCAR RAMALLO
SO MIN LEE
MATTHEW L. FARLEY


By_____*/s/ Sean M. SeLegue*_____
        SEAN M. SELEGUE]

*Attorneys for Appellant*
*Nexon Korea Corporation*

## CERTIFICATE OF COMPLIANCE
## (FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1)

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the foregoing Appellant's Opening Brief is proportionally spaced, in a typeface of 14 points or more and contains 8,109 words, exclusive of those materials not required to be counted under Rule 32(a)(7)(B)(iii).

DATED: December 18, 2023

_/s/ Sean M. SeLegue_
SEAN M. SELEGUE]

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 18, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  December 18, 2023

Respectfully,

ARNOLD & PORTER KAYE SCHOLER LLP
SEAN M. SELEGUE
JAMES K. LEE
JAMES S. BLACKBURN
OSCAR RAMALLO
SO MIN LEE
MATTHEW L. FARLEY

By _____*/s/ Sean M. SeLegue*_____
          SEAN M. SELEGUE]

*Attorneys for Appellant*
*Nexon Korea Corporation*

# STATUTORY ADDENDUM

STATUTORY ADDENDUM
TABLE OF CONTENTS

17 U.S.C. § 512........................................................SA1

28 U.S.C. § 1400......................................................SA5

## 17 U.S.C. § 512 (in pertinent part)

***

**(c) Information residing on systems or networks at direction of users.**—

    **(1) In general.**—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

        **(A)**

            **(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

            **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

            **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

        **(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

        **(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

***

    **(3) Elements of notification.**—

        **(A)** To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

**(i)** A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(ii)** Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

**(iii)** Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

**(iv)** Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

**(v)** A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

**(vi)** A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

***

**(g) Replacement of removed or disabled material and limitation on other liability.—**

**(1) No liability for taking down generally.**—Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or

based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

**(2) Exception.**—Paragraph (1) shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or to which access is disabled by the service provider, pursuant to a notice provided under subsection (c)(1)(C), unless the service provider—

> **(A)** takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;
>
> **(B)** upon receipt of a counter notification described in paragraph (3), promptly provides the person who provided the notification under subsection (c)(1)(C) with a copy of the counter notification, and informs that person that it will replace the removed material or cease disabling access to it in 10 business days; and
>
> **(C)** replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.

**(3) Contents of counter notification.**—To be effective under this subsection, a counter notification must be a written communication provided to the service provider's designated agent that includes substantially the following:

> **(A)** A physical or electronic signature of the subscriber.
>
> **(B)** Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared

before it was removed or access to it was disabled.

**(C)** A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

**(D)** The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.

**\*\*\***

**(k)Definitions.—**

　　**(1)Service provider.—**

**(A)** As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

**(B)** As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

## 28 U.S.C. § 1400 (in pertinent part)

(a) Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found.